Filed 10/21/14  P. v. Woody CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN FREDERICK WOODY, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B246390<br>(Super. Ct. No. F457894)<br>(San Luis Obispo County) |

John Frederick Woody, Jr. appeals a judgment after conviction by jury of first degree murder with use of a deadly weapon.  The trial court found he was sane at the time of the murder (in a bifurcated trial).  It also found he had a prior strike conviction and a prior serious felony conviction.  The court sentenced Woody to 56 years to life in prison, with 645 days of presentence custody credit.

Woody experienced auditory hallucinations during the offense.  He contends the trial court prejudicially erred when it refused to instruct the jury pursuant to CALCRIM No. 522 that provocation can reduce first degree murder to second degree murder.  We conclude CALCRIM No. 522 has no application here.  CALCRIM No. 627 adequately informed the jury of the effect of hallucinations on premeditation and deliberation.  We correct the judgment to award 655 days of presentence custody credit and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Woody suffers from a severe mental disorder for which he has been hospitalized numerous times. He experiences auditory hallucinations and delusions.

On the evening of May 7, 2011, Woody had not taken his antipsychotic medications for about two weeks. He was driving from Sacramento to Mexico. When he ran out of money, he stopped in Paso Robles and tried to use a credit card in a liquor store without success. He tried to sleep in his truck until he could go to a bank in the morning.

Woody heard voices calling him a "crackhead," "junky," and "nigger." He became very agitated and walked around in his socks, looking for the source of the voices. He concluded they came from Martin James McWilliams who was standing inside a laundromat. He walked up to McWilliams and fatally stabbed him 30 times. Woody drove away in his truck.

The laundromat's video surveillance camera captured the attack. The liquor store's camera captured an image of Woody's truck. Bloody sock prints led from the laundromat to an empty parking place.

At 8:30 a.m. the following morning, Woody called 911 and said, "Yes, I would like to, uh, report an incident that happened the other night. Uh, I'm not really sure where I'm at but I would like to go down to the police station." At about 9:00 a.m., Woody went into a bank in Atascadero and tried to withdraw money from an account at a different bank. An employee called the police. When a police officer responded, Woody told him, "I need to go to jail." Woody's conduct was "bizarre."

Woody had changed his clothes. A pair of bloody socks was under the truck's front seat. McWilliams's blood was on Woody's truck.

Woody waived his *Miranda* rights and confessed to killing McWilliams. The jury heard his recorded interview. Woody said he tried to sleep in his truck but heard voices. He said, "[E]veryone on the street was calling me a 'crack head' so I couldn't sleep and I, you know, just fol – just follow the wind." Woody saw McWilliams talking to him. Woody said he went into the laundromat knowing he would stab McWilliams.

2

"[Question] So you were looking around to make sure no one was around? [Answer] Yes. [Question] And, then you knew walkin' in there you were gonna -- gonna stab him? [Answer] Yes." Woody said that when he walked in he told McWilliams, "I got something for you." McWilliams saw the knife and said, "Don't do it." Woody said he intended to kill McWilliams. "[Question] Did you intend to kill that guy last night? [Answer] Yes. [Question] Because he was saying things about you? [Answer] Yes. Disrespecting me." Woody also said he "cut up" McWilliams because "[McWilliams] saw [him] in America." Woody said that he "threw . . . away" the knife and his clothes.

The trial court suspended criminal proceedings for seven months during which Woody was not competent to stand trial. Treatment at a state hospital restored his competence. Woody pled not guilty to first degree murder by reason of insanity and waived his right to a jury for the sanity phase of trial.

In the guilt phase, Woody presented the testimony of four mental health experts. Psychologist Thomas Middleton testified that Woody was diagnosed with schizoaffective disorder in 2003. He said Woody experiences hallucination, delusions and disorganized thought. In Middleton's opinion, Woody was experiencing psychotic decompensation when he attacked McWilliams. Woody was not in control of his behavior or contemplating the consequences of his actions. He was "controlled by his auditory hallucinations." Middleton said, "He was trying to decrease the stress that he was feeling and make the voices go away." Woody believed that McWilliams was telepathically communicating with him using derogatory names. Woody stabbed McWilliams to stop the voices.

Middleton explained that auditory hallucinations are "menacing" and "a threatening presence in your head that becomes increasingly demanding of attention." They become "increasingly difficult to resist and ignore" and one "eventually [has] to act out in order to reduce the internal stress and pressure." When Woody left the scene and threw away his clothes and the knife, he was trying to "flee persecution and threat . . . on a psychotic basis." Woody believed the smell of blood on the clothes was "sucking the

3

air out of his lungs." His conduct did not demonstrate organized thought. Middleton also described the ways in which Woody was abused as a child and the various times Woody was hospitalized for mental health treatment. He testified that, even with medication, Woody's symptoms are "continuous, ongoing, severe and disabling."

Another psychologist, Carolyn Murphy, described Woody's auditory hallucinations as "very provocative." Woody stabbed McWilliams because "he was driven by the voices in that he believed . . . he needed to stop them." He experiences "command hallucinations." His mental illness was "disorganizing enough that he was acting very impulsively and very irrationally." The hallucinations were threatening, and his "anger was borne of fear of that threat."

A staff psychiatrist from Patton State Hospital, Jeffrey Lawley, testified that Woody suffers from paranoid schizophrenia and antisocial personality disorder. Woody experienced auditory hallucinations and paranoid delusions while at Patton from May 2011 to November 2011. Woody was not malingering. Hallucinations and delusions can be frightening and threatening. Without medications, Woody decompensates.

Another psychologist, Brandi Mathews, testified that Woody suffers from schizoaffective disorder with a history of auditory hallucinations. Mathews conducted a court-ordered evaluation of Woody in May 2012. She testified that Woody experiences hallucinations in which voices command him to hurt others or himself. But according to this expert, Woody's behavior was "purposeful" and "goal oriented" on the night of the murder, even though it was "related to a loss of touch with reality."

In rebuttal, the prosecution presented a psychiatrist from Atascadero State Hospital, David Fennell. When Fennell interviewed Woody at the jail two days after the murder, he "did not notice a significant thought disorder." Woody seemed mildly paranoid, withdrawn, and "a bit depressed." He was not experiencing hallucinations. Woody told him that he had experienced hallucinations in connection with substance

4

abuse in the past. Fennell suspected schizoaffective disorder or schizophrenia. He said he would have liked to continue the interview longer.

The prosecution also presented a psychologist, Kris Mohandie, in rebuttal. Mohandie testified that Woody's behavior was goal-oriented before, during and after he stabbed McWilliams. The voices were "very provocative" and made Woody feel disrespected and angry. Woody chose to act on that anger with "a criminal mentality." Mohandie testified that Woody exaggerated his symptoms during an evaluation in July 2012.

The trial court instructed the jury pursuant to CALCRIM No. 627 that "[a] hallucination is a perception not based on objective reality." It instructed the jury: "You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation." The court refused to instruct the jury on provocation or voluntary manslaughter (CALCRIM Nos. 522 and 570) because there was no evidence of a provocative act.

In closing argument, defense counsel acknowledged that Woody killed McWilliams, but argued that evidence of Woody's mental illness, including the command hallucinations, raised a reasonable doubt whether Woody premeditated and deliberated.

DISCUSSION

*Provocation Instruction*

Woody contends that his conviction must be reversed because the trial court refused to instruct the jury that provocation can reduce murder from first to second degree. (CALCRIM No. 522, formerly CALJIC No. 8.73 )[1] We disagree. CALCRIM No. 627 adequately covers the theory that hallucinations raise a reasonable doubt whether the defendant premeditated or deliberated.

---

[1]CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

5

A provocation instruction is a pinpoint instruction because it "'relate[s] particular facts to a legal issue in the case or "pinpoint[s]" the crux of a defendant's case . . . .'" (*People v. Rogers* (2006) 39 Cal.4th 826, 878.) A trial court must give a pinpoint instruction on request if the evidence supports it. (*Ibid.*)

Evidence of hallucination can reduce murder from first to second degree by raising a reasonable doubt whether the defendant premeditated and deliberated. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 679.) The trial court gave CALCRIM No. 627, a pinpoint instruction that is based on the holding in *Padilla*. Woody contends the trial court should also have given CALCRIM No. 522, the general pinpoint instruction on provocation.

CALCRIM No. 522 asks the jury to decide whether the defendant "was provoked" and to "consider the provocation in deciding whether the crime was first or second degree murder." It is based on *People v. Thomas* (1945) 25 Cal.2d 880, 903, and its progeny, cases in which there was some evidence of conduct of another that may have aroused the defendant. For example, in *Thomas*, at page 887, there was evidence that the defendant overheard a conversation that led him to believe the victim had been unfaithful. Similarly, in *People v. Rogers*, *supra*, 39 Cal.4th 826, 844-845, there was evidence that the victim made derogatory comments about the defendant.

Here, there was no evidence that the victim or anyone else did or said anything that may have influenced Woody's actions. The only "provocation" was a "menacing" and "threatening presence in [Woody's] head" that demanded his attention and "command[ed]" him to act. In these circumstances, CALCRIM No. 627 is the appropriate pinpoint instruction because it specifically addresses the theory that hallucinations can raise a doubt about premeditation and deliberation.

*Ineffective Assistance of Counsel*

Woody has not established deficient performance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) His attorney made an adequate record of the request for CALCRIM No. 522.

6

*Custody Credits*

Woody served 655 days in presentence custody, but the trial court awarded 645 days credit, as the People concede. We order the abstract of judgment corrected.

DISPOSITION

The trial court is directed to correct the abstract of judgment to award Woody 655 days of presentence custody credit and to forward a corrected copy to the Department of Corrections and Rehabilitation Services. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.

7

Michael L. Duffy, Judge

Superior Court County of San Luis Obispo

_____

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Herbert S. Tetef, Deputy Attorney General, for Plaintiff and Respondent.